**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| VICTORIA GARRIDO HERNANDEZ, | |
| Plaintiff, | |
| v. | Civil Action No. 22-01556(FLW) |
| KILOLO KIJAKAZI, | **OPINION** |
| Commissioner of Social Security, | |
| Defendant. | |

**WOLFSON, Chief Judge:**

Victoria Garrido Hernandez ("Plaintiff") appeals from the final decision of the Acting Commissioner of Social Security, Kilolo Kijakazi ("Defendant"), denying Plaintiff's application for disability under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record (A.R.), the Court finds that the Administrative Law Judge's ("ALJ") decision was based on substantial evidence, and accordingly, the ALJ's decision is **AFFIRMED**.

## I.     FACTUAL AND PROCEDURAL HISTORY

Plaintiff, born on November 21, 1956, was 61 years old on July 12, 2018, the alleged onset date of her disability. (A.R. 17, 29, 207.) Plaintiff has a college education and has past relevant work as a nurse supervisor and general nurse. (A.R. 28, 62–63, 211, 228, 998.) On July 31, 2018, Plaintiff filed a Title II application for a disability and disability insurance benefits due to choroidal osteoma, frequent nose bleeds, thyroid cancer, malignant hypertension, chronic pain and fatigue, systemic lupus erythematosus, rheumatoid arthritis, depression, anxiety, and stress. (A.R. 15, 210.)

Plaintiff's application was denied initially on February 9, 2019, and again upon reconsideration on May 13, 2019. (A.R. 15.) Plaintiff then filed a written request for a hearing before an administrative law judge, which was held on September 29, 2020, before Jennifer Pustizzi. (A.R. 15, 41.) On January 12, 2021, the ALJ determined Plaintiff was not disabled under the meaning of the Social Security Act from July 12, 2018 through January 21, 2021. (A.R. 15–16.) Plaintiff requested review of the ALJ's decision by the Appeals Council, which was denied on January 25, 2022. (A.R. 1.) Thereafter, Plaintiff filed the instant appeal on March 20, 2022. (ECF No. 1.)

### A.   Review of Mental Health Evidence[1]

#### i.   Plaintiff's Hearing Testimony

At the September 29, 2020 hearing before the ALJ, Plaintiff testified regarding her mental health treatment. Plaintiff testified that she had previously been prescribed and had taken Cymbalta because it was effective for her depression and for pain. (A.R. 51.) However, Plaintiff explained that she stopped taking Cymbalta because she experienced hallucinations as a side effect and has not taken any other medications for her mental health issues since. (A.R. 51.) Plaintiff also stated that she did not see any type of therapist or counselor for depression or anxiety. (A.R. 52.) In addition, Plaintiff testified that she tries to go on walks each day with her husband for about three miles total, taking a break after about one mile. (A.R. 51, 59.)

#### ii.   Plaintiff's Function Report

Plaintiff completed a function report on September 11, 2018 ("Function Report"). In her report, Plaintiff stated that her daily activities include spending time taking care of her dog and

---

[1] Plaintiff's appeal relates to the ALJ's consideration of her mental health impairments. As such, the Court recitation and review of the facts focus on evidence regarding Plaintiff's mental health.

2

doing housework. (A.R. 235–236, 247.) Plaintiff reported no problems with personal care, (A.R. 235), and noted that she can drive, shop in stores for food, handle financial tasks, and prepares meals approximately twice a week. (A.R. 236, 237.) Socially, Plaintiff reported that she does not do many activities, but does attend church every week. (A.R. 238.) Plaintiff stated that she has no problem getting along with authority figures nor has she ever been fired from a job due to issues getting along with other people. (A.R. 240.) In terms of abilities, while Plaintiff reported some issues with memory and concentration, she has no problem following instructions, handling changes in her routine, and finishing what she starts. (A.R. 238–40.) Plaintiff did report fears of dying in her sleep. (A.R. 240.)

### iii.    Consultative Mental Status Examination with Victoria C. Miller, Ph.D.

On January 17, 2019, psychologist Victoria C. Miller, Ph.D., conducted a mental status examination of Plaintiff, during which she diagnosed Plaintiff with adjustment disorder with mixed anxiety and depressed mood. (A.R. 1007–08.)

During the examination, Dr. Miller observed that Plaintiff was pleasant and cooperative, was alert and fully oriented, had normal motor behavior, and had fair judgment, insight and impulse control. (A.R. 1008.) Plaintiff also stated that she did not have thoughts of wanting to harm herself or anyone else. (*Id.*)

In terms of Plaintiff's mental health history, Plaintiff stated that she was briefly treated in the past with Cymbalta, but she had side effects from it, such as hallucinations, and she did not pursue other medications to address her issues with mood. (A.R. 1007.) Plaintiff explained that she had not pursued psychotherapy because she had a good support system through her husband and one of her sons. (A.R. 1007–08.) Plaintiff reported issues with anxiety and dysphoria stemming from increasing stress from her job as a nurse. (A.R. 1007.) She also reported issues

with fatigue and diminished energy, as well as additional stress due to ongoing discord in her relationship with one of her sons. (*Id*.) She denied a history of major depression, hospitalizations, hallucinations, or delusions. She also stated that she had never suffered mania, paranoia, or impulses towards violence. (*Id*.)

In terms of Plaintiff's abilities, Dr. Miller found that Plaintiff had mild concentration problems with active working memory, but there were no indications of any active thought disorder. (A.R. 1008.) Dr. Miller conducted several mental exercises with Plaintiff. (*Id*.) For instance, Plaintiff could name current and former presidents, could spell the word "world" forwards and backwards, completed five trials of serial sevens with no errors, recalled three items immediately after a delay. (*Id*.) Plaintiff, in recalling six digits forwards, reversed three digits backwards. (*Id*.) Dr. Miller also noted that Plaintiff had adequate mentation and skills sufficient to manage her own funds without the need for support. (*Id*.)

In terms of Plaintiff's daily activities, Dr. Miller reported that Plaintiff spends her time at home caring for her dog, attending to personal care without assistance, and housework with accommodations. (A.R. 1008.) Plaintiff reported that she was learning to cook and that her husband does most of the shopping. Plaintiff stated that she can drive, but avoids doing so at night due to vision problems. (*Id*.) Socially, Plaintiff reported that she had regular contact with old coworkers and friends, and that her husband and son are good support for her. Plaintiff also reported issues sleeping. (*Id*.)

      *iv.*     *State Agency Opinions*

State-agency psychology consultants, Cheryl Sanford, Ph.D. and Crystal M. Duclos, Psy.D., reviewed the record on separate occasions in January 2019 and May 2019, respectively.

On January 30, 2019, Dr. Sanford found that Plaintiff had only mild limitations in concentration, persistence, or maintaining pace. (A.R. 84–85.) Dr. Sanford opined that there was sufficient evidence to support a finding of a non-severe mental impairment. (A.R. 85.) Dr. Sanford reasoned that Plaintiff's mental symptoms, while present, did not significantly impede functioning, and further opined that Plaintiff retained the ability to understand, remember, apply information and sustain concentration, persistence, and pace to fulfill the mental demands of tasks. (*Id.*)

Thereafter, on May 8, 2019, Dr. Duclos affirmed Dr. Sanford's prior decision and noted that Plaintiff, on reconsideration, did not allege changes in her mental conditions or provide any new mental medical sources. (A.R. 100.)

## B.    The ALJ's Findings

On January 12, 2021, the ALJ issued a written decision analyzing whether Plaintiff satisfied her burden of demonstrating disability using the standard five-step process.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 12, 2018. (A.R. 17.) At step two, the ALJ found that Plaintiff suffered from the following severe impairments: rheumatoid arthritis, systemic lupus erythematosus, and degenerative disc disease. (A.R. 18.) Regarding Plaintiff's medically determinable mental impairments of adjustment disorder and anxiety disorder, the ALJ found they did not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities and consequently, were non-severe. (A.R. 19.) In making this finding, the ALJ considered the four broad areas of mental functioning, also known as the "paragraph B" criteria, set out in the regulations: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; (4) adapting or managing oneself. (A.R. 19–21.) For understanding, remembering, or applying information, the ALJ found Plaintiff had a mild limitation, based on

5

evidence from her consultative mental status examination. (A.R. 20.) For interacting with others, the ALJ found Plaintiff had a mild limitation, based on evidence from her consultative mental status examination and her Function Report. (*Id*.) With respect to concentrating, persisting, or maintaining pace, the ALJ found Plaintiff had a mild limitation due to evidence of mild concentration issues from her consultative mental status examination. (*Id*.) Finally, the ALJ found Plaintiff had no limitation in adapting or managing herself based on her independent ability to handle her personal care, clean her house, drive and, cook, evidenced from her consultative mental status examination and her Function Report. (*Id*.)

Before proceeding to step three, the ALJ noted her findings at step two were not an assessment of Plaintiff's residual functional capacity ("RFC"), but would still be considered in formulating the RFC:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(A.R. 21.) At step three, the ALJ found that none of these mental-related impairments, or any combination of these impairments, met or medically equaled the severity of any listed impairments in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). (A.R. 18–21.) At step four, the ALJ found that Plaintiff had the RFC to perform light work as defined by 20 C.F.R. § 404.1567(b), with modifications. (A.R. 21.) Light work is defined in the regulations as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we

determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b). The ALJ noted the following modifications: "can lift and carry a maximum of 15 pounds; can occasionally climb ramps and stairs; cannot ever climb ladders, ropes, or scaffolds; and can occasionally balance, stoop, kneel, crouch and crawl." (A.R. 21.) This RFC, the ALJ found, was insufficient to meet the requirements of Plaintiff's past relevant work as a head nurse, which Plaintiff performed at a medium exertional level. (A.R. 28.) The ALJ's RFC determination was based on consideration of "all [Plaintiff's] symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence". (A.R. 21.) The ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record" and, thus, "[b]ased on the evidence in the record", "[Plaintiff] is capable of performing light exertional level work." (A.R. 27–28.)

At step five, the ALJ found that there are jobs existing in significant numbers in the national economy which Plaintiff can perform, given her age, education, work experience, and residual functional capacity. (A.R. 29–30.) Based on the testimony of the Vocational Expert ("VE") and considering the above factors in addition to the limitations of Plaintiff's RFC, the ALJ found that Plaintiff had transferable work skills from her past relevant work that were transferable to various occupations such as Office Nurse, Nurse Supervisor, and School Nurse. (A.R. 30.) Thus, Plaintiff would be capable of successfully adjusting to other work that exists in significant numbers in the national economy. (*Id*.) The ALJ concluded that Plaintiff had not been under a disability, as defined in the Act, from July 12, 2018, through the date of her decision on January 12, 2021. (*Id*.)

## II.    **STANDARD OF REVIEW**

On a review of a final decision of the Commissioner of the Social Security Administration ("SSA"), a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (internal quotations and citations omitted). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…" *Id*. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id*. § 1382c(a)(3)(A) – (B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id*. § 404.1520(a)(4)(i); *see Bowen v. Yuckert*, 482 U.S. 137, 146–47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146–47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id*. § 404.1522(b)(1). A claimant who does not have a severe impairment is not considered disabled. *Id*. at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in the Impairment List. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity

9

to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id*. § 404.1520(d); *see also Bowen*, 482 U.S. at 146–47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id*. An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186. If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the RFC to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141.

If the claimant can perform past relevant work, the claimant is determined to not be disabled. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e); *see also Bowen*, 482 U.S. at 141–42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *See Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her past relevant work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146–47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's RFC, age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant can perform work and not disabled. *Id*.

III.   **PLANTIFF'S CLAIM ON APPEAL**

Plaintiff raises two issues on appeal. First, Plaintiff argues that the ALJ erred by failing to account for the impact of her mild mental limitations in the RFC assessment or in the hypothetical questions posed to the VE. (Pl. Br. at 4, 15.) Even if the ALJ did consider Plaintiff's mild mental limitations in her step four assessment, Plaintiff claims the ALJ erred in failing to explain explicitly why she omitted them from her final RFC determination and how Plaintiff could perform skilled work with her mild mental limitations. (Pl. Br. at 4, 8, 11.)[2]

Second, Plaintiff argues that the ALJ and Appeals Council members lacked authority because they were not properly appointed under both the Federal Vacancies Reform Act, 5 U.S.C. 3345 *et seq.* (1998) ("FVRA"), and the Constitution's Appointments Clause, U.S. Const. art. II, § 2, cl. 2. (Pl. Br. at 15–17.)

   A.   **The ALJ's RFC determination properly accounted for Plaintiff's mild, non-severe mental impairments.**

At step four, the RFC assessment is where the ALJ determines whether, despite limitations, the claimant retains capacity to perform her past relevant work. *See Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007); *see also* 20 C.F.R. § 404.1545(a)(5)(i). In making an RFC determination, "the ALJ must consider all evidence before [her]." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1). However, the Third Circuit's holding in *Burnett* "does not require the ALJ to use particular language or adhere to a particular format in conducting [her] analysis. Rather, the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett*,

---

[2] Notably, Plaintiff does not contest any of the ALJ's findings with respect to her mental impairments at step two.

220 F.3d at 120). Further, "[w]here the ALJ's findings of fact are supported by substantial evidence, [district courts] are bound by those findings, even if [the courts] would have decided the factual inquiry differently." *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012) (internal quotation marks and citation omitted).

In this matter, Plaintiff argues that the ALJ failed to consider the mild mental limitations she found in step two in her step four RFC determination that Plaintiff could perform skilled work. (Pl. Br. at 4.) Specifically, Plaintiff asserts that the ALJ failed to apply Plaintiff's mild mental limitations in understanding, remembering, or applying information, interacting with others, and concentrating, persisting or maintaining pace. (*Id.* at 5–6.) Alternatively, even if the ALJ declined to adopt any mental limitations in her RFC assessment, Plaintiff claims that the ALJ still erred by failing to offer any explanation as to why the ALJ did not accommodate Plaintiff's mental limitations in the RFC or in the subsequent determination that Plaintiff could perform skilled work. (*Id.* at 7–8.) In response, Defendant argues that the ALJ's RFC assessment is supported by substantial evidence. (Def. Br. at 11.)

Having reviewed the ALJ's decision and the administrative record, I find that, contrary to Plaintiff's contentions, the ALJ did consider Plaintiff's mental impairments at step four of the sequential analysis. *See Berry v. Kijakazi*, No. 20-1629, 2021 WL 7162435, at *7 (M.D. Pa. Dec. 20, 2021), *report and recommendation adopted*, No. 20-01629, 2022 WL 551246 (M.D. Pa. Feb. 23, 2022) (explaining the holistic nature of an ALJ's analysis); *see also Jones*, 364 F.3d at 505 (ALJ decisions are read "as a whole.").

As an initial matter, the ALJ, in her RFC determination, "must consider limitations and restrictions imposed by all of an individual's impairments," including any mild or non-severe limitations found at step two. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 209 (3d Cir. 2019)

(internal quotations and citations omitted). Indeed, the Third Circuit has held that the step two and three findings are "plainly relevant" to the ALJ's later step four analysis because it involves "the claimant's actual impairments." *Id*. However, the step two and step three "findings need only be '*adequately conveyed*' in the ALJ's statement of the limitation, *not recited verbatim*." *Id*. (emphasis added). Further, "the ALJ need only include in the RFC those limitations which [s]he finds credible." *Garrett v. Comm'r of Soc. Sec*., 274 Fed.Appx. 159, 163 (3d Cir. Apr. 17, 2008) (citing *Burnett*, 220 F.3d at 121). In doing so, the ALJ may weigh the credibility of the evidence provided that she "must give some indication of the evidence which [she] rejects and [her] reason(s) for discounting such evidence." *Burnett*, 220 F.3d at 121 (citations omitted). Where the ALJ concludes that a claimant's limitation is "so minimal or negligible that ... it would not limit her ability" to perform certain work tasks, the ALJ may exclude that limitation from the RFC without error. *Ramirez v. Barnhart*, 372 F.3d 546, 555 (3d Cir. 2004); *see also Lee v. Comm'r of Soc. Sec*., 248 Fed.Appx. 458, 462 (3d Cir. 2007) (reasoning "[t]here was no need to include a mental impairment in the hypothetical as the determination that her condition was not severe was supported by substantial evidence.").

Here, initially at step two, the ALJ considered evidence of Plaintiff's mental health impairments and understood their impact before determining Plaintiff's RFC. The ALJ found that Plaintiff had mild impairments in three of the four functional areas of mental functioning. (A.R. 19–20.) Indeed, the ALJ determined that Plaintiff's mental impairments were non-severe because they did not cause more than "minimal limitation" in Plaintiff's ability to perform basic mental work activities. (A.R. 19.) In reaching her findings, the ALJ relied primarily on Plaintiff's testimony at the hearing on September 29, 2020, her statements made in her Function Report, and evidence from Plaintiff's consultative mental status examination with Dr. Miller. (A.R. 19–20.)

This included testimony about Plaintiff's limited mental health treatment. For instance, Plaintiff testified at the hearing and told Dr. Miller that she had been briefly treated with Cymbalta for her depression and anxiety but that she stopped taking it due to hallucinations. (A.R. 19, 51, 1007.) She also testified that since then, she had not pursued or taken any other medication for depression and anxiety. (A.R. 19, 51, 1007.) Plaintiff further testified that she had not seen a therapist or counselor for her depression or anxiety. (A.R. 19, 52.)

The ALJ also considered evidence, based on self-reported symptoms and findings from Dr. Miller's examination, that demonstrated Plaintiff's mental impairments were minimal. During Plaintiff's examination, Dr. Miller diagnosed her with adjustment disorder with mixed anxiety and depressed mood. (A.R. 20, 1008.) Plaintiff told Dr. Miller that an ongoing source of stress was discord in her relationship with one of her sons. (A.R. 20, 1007.) Plaintiff reported that she did not have a history of major depression, hospitalizations, hallucinations or delusions, nor did she have any thoughts of wanting to harm herself or anyone else. (A.R. 19–20, 1007–08.) In the first functional area of understanding, remembering, or applying information, the ALJ found Plaintiff had a mild limitation. (A.R. 20.) The ALJ cited to Plaintiff's examination with Dr. Miller during which Plaintiff performed various mental recall exercises with minimal errors. (A.R. 20, 1008.) In the second functional area, interreacting with others, the ALJ also found a mild limitation. (A.R. 20.) For support, the ALJ cited to statements Plaintiff made to Dr. Miller that she never pursued psychotherapy to treat her anxiety or depression because she had a good support system. (A.R. 20, 1007–08.) Further, Dr. Miller described Plaintiff as pleasant and cooperative. (A.R. 20, 1008.) The ALJ also cited to Plaintiff's Function Report in which she reported that she had no problem getting along with others. (A.R. 20, 240.) In the third functional area involving concentrating, persisting or maintaining pace, the ALJ found Plaintiff had a mild limitation. (A.R. 20.) The ALJ relied on

Dr. Miller's finding that Plaintiff had mild concentration problems with active working memory, (A.R. 20, 1008), and further cited to Plaintiff's Function Report in which she reported that her impairments affected her ability to concentrate but that she had no problem paying attention and finishing what she started. (A.R. 20, 238–40.) In the fourth functional area, the ALJ found no limitation based on evidence that Plaintiff independently handles her personal care, including cleaning her house, driving during the day and cooking meals twice a week. (A.R. 20, 235–36, 1008.)

Finally, the ALJ also noted that the opinions by the two state agency psychologists finding Plaintiff's mental impairments to be non-severe was consistent with the evidence in the record. (A.R. 20, 84–85, 100.) In fact, the record contained no additional medical examinations or other medical evidence for Plaintiff's mental health.

As such, I find that the ALJ's finding at this step was based on her substantial consideration and in-depth analysis of the record with respect to Plaintiff's mental impairments. *See, e.g., Sleap v. Kijakazi*, No. 20-14002, 2022 WL 475874, at *7 (D.N.J. Feb. 16, 2022) (finding that substantial evidence supported the ALJ's step two finding that the claimant's depressive and anxiety disorders were non-severe where, *inter alia*, the claimant had "no history of psychiatric hospitalizations, nor had she been prescribed psychotropic medications", the claimant could "drive, go out alone, handle her finances, play with her children, and shop online, among other things", mental status exams were normal, there was "little mental health treatment overall", and psychological consultative examinations revealed, *inter alia*, that the claimant "was appropriate, had logical and goal-directed thought processes, good to fair concentration, and excellent intellectual functioning and abstract thinking"); *Cruz Vargas v. Comm'r of Soc. Sec.*, No. 20-0587, 2021 WL 1541047, at *4–5 (D.N.J. Apr. 19, 2021) (concluding that substantial evidence supported the ALJ's step two finding that the

claimant's mental impairments were not severe where there was no evidence of mental health treatment before her date last insured, that "evaluations were normal with the exception of some mild impairments[,]" and that medication helped the claimant's mental impairments (internal quotations omitted)); *Rolick v. Berryhill*, No. 17-4481, 2019 WL 625599, at *5 (D.N.J. Feb. 14, 2019) (finding that while the claimant "does have mental health conditions that undoubtedly produced symptoms, the ALJ had a more than adequate basis for concluding that those mental health conditions were not severe as that term is used within the Act" where the claimant's "mental health examinations demonstrated adequate mental functioning with intact thought processes, memory span, and concentration" and "[i]t would be inappropriate for this Court to substitute its own judgment in weighing the mental health evidence because the ALJ properly relied on substantial evidence in her determination that [the claimant's] mental health impairments were non-severe and caused only mild limitations.").

Accordingly, at step four, the ALJ did not commit a reversible error by relying on her thorough step-two findings. While the ALJ did not explicitly address Plaintiff's mild mental limitations in her RFC determination, as noted earlier, the Third Circuit has held that "findings at steps two and three will not necessarily translate to the language used at steps four and five". *Hess*, 931 F.3d at 209. In fact, the Third Circuit and several district courts within this Circuit have held that "an RFC assessment does not need to contain in-depth analysis on mental impairments when the ALJ finds earlier in his opinion that a claimant's mental impairments are no greater than mild." *D.C. v. Comm'r of Soc. Sec.*, No. 20-2484, 2021 WL 1851830, at *6 (D.N.J. May 10, 2021) (citations omitted) (collecting cases); *see also Holley v. Comm'r Soc. Sec.*, 590 F.App'x 167, 169 (3d Cir. 2014) (holding that the ALJ did not err by not including mental limitations in the RFC when the ALJ found that the plaintiff "had—at most—minor mental impairments.").

Further, just because the ALJ found mild mental limitations at step two does not obligate her to deem them credible and thus, adopt them into her RFC determination. *See, e.g., Makowski v. Comm'r of Soc. Sec.*, No. 16-1656, 2017 WL 3151243, at *7 (D.N.J. July 24, 2017) (quoting *Ramirez v. Barnhart*, 372 F.3d 546, 555 (3d Cir. 2004)) (finding that "even if the ALJ did not discuss the impact of the admittedly mild limitations from Plaintiff's mental impairments at the RFC stage, despite having discussed them at length elsewhere in the opinion, this omission is not reversible error because the ALJ was entitled to not include 'minimal or negligible' deficiencies in the RFC."). As stated above, ALJs are required only to include "credibly established limitations". *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) (citation omitted); *see also Burnett*, 220 F.3d at 121 (holding that the ALJ has discretion to determine which limitations are credible by weighing the credibility of the evidence, provided she "give some indication of the evidence which [s]he rejects and [her] reason(s) for discounting such evidence.")

Here, after conducting an in-depth analysis of Plaintiff's mental limitations at step two, the ALJ provided adequate explanation for her omission of Plaintiff's mild mental limitations from her RFC determination. (A.R. 21.) Specifically, the ALJ stated that she did consider Plaintiff's non-severe mental impairments in determining the RFC and that their consideration did not result in limitations beyond those included in her final RFC determination. (*Id.*) (noting, also, that the ALJ considered the "entire record" in determining the RFC). Plaintiff takes issue with the ALJ's use of "boilerplate language" here to explain the relationship between the step two analysis and the RFC analysis. (Pl. Reply. Br. at 2.) However, other courts in this Circuit have addressed nearly identical language in holding that the step four RFC analysis adequately reflected the ALJ's step two in-depth analysis of mental limitations. *See, e.g., Gita P. v. Comm'r of Soc. Sec. Admin.*, No. 21-6087, 2022 WL 1683834, at *6 (D.N.J. May 26, 2022) (finding that the ALJ did not err in

relying on his thorough step-two analysis finding mild mental limitations in crafting the plaintiff's RFC determination); *Jennifer B. v. Kijakazi*, No. 20-20364, 2022 WL 577960, at *12 (D.N.J. Feb. 25, 2022) (finding that, in using nearly identical language as the present case, the ALJ expressly considered mild mental limitations from step two when crafting plaintiff's RFC); *D.C.*, 2021 WL1851830, at *5 (finding that "[t]his discussion and incorporation by reference is sufficient to satisfy the requirement that the ALJ consider all of the Plaintiff's impairments in formulating the RFC"); *Long v. Kijakazi*, No. 20-1358, 2022 WL 609620, at *8 (D. Del. Jan. 31, 2022) (finding that because the plaintiff's mild mental impairments did not translate into work-related limitations, the ALJ's failure to explicitly discuss those impairments in the RFC analysis did not amount to an error); *Brumfield v. Saul*, No. 19-4555, 2020 WL 4934315, at *6 (E.D. Pa. Aug. 21, 2020) (holding that an RFC assessment without any non-severe mental limitations was consistent with the step two analysis finding non-severe depression and anxiety impairments).

Finally, the ALJ's analysis of the evidence at step four also provides substantial support for her decision to exclude Plaintiff's mild mental limitations from her final RFC determination. (A.R. 21–28.) In reaching her RFC finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence[,]" as well as "the medical opinion(s) and prior administrative medical findings[.]" (A.R. 20.) In so doing, the ALJ reviewed the medical and testimonial evidence at length, including evidence from Plaintiff's hearing testimony, examination findings, medical opinions, and medical records. (A.R. 21–28.) For instance, the ALJ noted that Plaintiff was able to independently handle her personal care, including cooking, doing household chores, driving during the daytime, and handling financial tasks. (A.R. 27.) The ALJ cited to Plaintiff's own testimony describing her typical daily activity, including walking at least a mile and up to three miles in 60 minutes. (A.R.

27, 51, 59, 998, 1008.) In her consideration of the evidence, the ALJ also reported that, during her consultative internal medicine examination with Dr. Francky Merlin, M.D., Plaintiff stated that she was "able to walk a mile, take care of her personal hygiene and do household chores". (A.R. 27, 998.) Additionally, the ALJ cited to several medical examination records in which different medical professionals noted that Plaintiff was "alert", "oriented", "well developed", "nourished", "comfortable". (A.R. 25, 26, 999, 1008.) These "relatively stable and unremarkable" examination findings, the ALJ found, demonstrated Plaintiff had normal motor strength and normal sensation. (A.R. 27–28.) Accordingly, the Court finds that the ALJ's RFC determination was based on more than a "mere scintilla" of evidence. *See McCrea*, 370 F.3d at 360 ("Although substantial evidence is more than a mere scintilla, it need not rise to the level of a preponderance.")

In sum, having carefully reviewed the underlying record and for the reasons above, I find that the ALJ's decision was supported by substantial evidence at step four, and as such, a remand would not be appropriate. *Johnson v. Comm'r of Soc. Sec.*, 497 F.App'x 199, 201 (3d Cir. 2012) (stating that the court "will uphold the ALJ's decision even if there is contrary evidence that would justify the opposite conclusion, as long as the substantial evidence standard is satisfied." (internal quotations and citation omitted)).

As a final note, even if the ALJ's consideration of Plaintiff's mild mental impairments was incomplete, any error was harmless. *See, e.g., Rutherford*, 399 F.3d at 553 (stating that remand is not required when it would not affect the outcome of the case). The record contains sparse evidence pertaining to Plaintiff's depression and anxiety and any resulting work-related impairments. At the hearing, Plaintiff testified that she did not take any medication, nor did she see a therapist or counselor for her depression or anxiety. (A.R. 19, 51.) Beyond Plaintiff's prescription for Cymbalta, which she stopped taking without substituting it for a different medication, there is no

evidence in the record evidencing that Plaintiff sought or received any mental health treatment. (A.R. 19, 51, 1007.) Medical source opinions also assessed Plaintiff to have non-severe mental impairments. Dr. Miller diagnosed Plaintiff with adjustment disorder with mixed anxiety and depressed mood. (A.R. 20, 1008.) The state agency psychologists found that Plaintiff's mental impairments were not severe because "they do not significantly impede functioning. Retains ability to underst[and]/remem[ber]/apply information and sustain c[oncentration,] p[ersistence, and] p[ace] to fulfill the mental demands of tasks". (A.R. 84–85, 100.) Beyond this, the record contains no other medical source opinions or objective medical records evidencing any mental impairments. To the contrary, several medical professionals who treated Plaintiff for non-mental conditions during the relevant period observed that Plaintiff was "pleasant", "cooperative", "alert", "oriented", and had a normal mental status. (A.R. 20, 25, 26, 419, 424, 472, 819, 827, 833, 1027, 1495, 1893.)

Based on this limited mental health record, there is little evidence to support Plaintiff's claim that her mild mental impairments, when considered alone or in combination with her other impairments, would result in work-related limitations. Indeed, Plaintiff fails to cite any other evidence demonstrating that her mental impairments would cause any additional limitations not considered by the ALJ. Accordingly, any alleged error by the ALJ was harmless. *See, e.g., Brumfield*, 2020 WL 4934315, at *8.

### B.      The ALJ's appointment by the Acting Commissioner was constitutional and statutorily valid.

In objecting to the constitutionality of the ALJ's appointment, Plaintiff argues that the then-Acting Commissioner Nancy A. Berryhill exceeded the statutory term limit under the FVRA when she ratified the appointment of Plaintiff's ALJ in July 2018. (Pl. Br. at 16–17.)

The FVRA provides the means for "temporarily authorizing an acting official to perform the functions and duties"[3] of a vacant executive branch position requiring Presidential appointment and Senate confirmation. 5 U.S.C. § 3347. Individuals who may serve as an acting official are set forth in 5 U.S.C. § 3345, subject to the time limitations prescribed in 5 U.S.C. § 3346. An acting official may serve "for no longer than 210 days", *id.* § 3346(a)(1), or, if a nomination for the office is submitted to the Senate, "for the period that the nomination is pending in the Senate", *id.* § 3346(a)(2).[4] The FVRA also contains an enforcement provision, which provides that "[u]nless an officer or employee is performing the functions and duties in accordance with sections 3345, 3346, and 3347 … the office shall remain vacant" and "only the head of such Executive agency may perform any function or duty of such office." *Id.* § 3348(b)(1)–(2). Any action taken by an acting official not in compliance with §§ 3345, 3346, and 3347 "shall have no force or effect." *Id.* § 3348(d).

Berryhill began serving as Acting Commissioner on January 20, 2017, and she served until her 210-day term ended, under 5 U.S.C. § 3346(a)(1), on November 16, 2017. (Pl. Br. at 16; Def. Br. at 19.) Following the expiration of Berryhill's initial term, as of November 17, 2017, the position of Commissioner became vacant. *See* 5 U.S.C. § 3348. On April 17, 2018, President Donald Trump nominated Andrew Saul to be the Commissioner. (Def. Br. at 19.) Upon submission of the nomination, the SSA interpreted 5 U.S.C. § 3346(a)(2) to permit Berryhill to resume her

---

[3] The FVRA defines the term "function or duty" to mean any function or duty of the application office that is established and required by statute or regulation to be performed solely by the applicable officer. 5 U.S.C. § 3348(a)(2). Courts have interpreted the FVRA to apply only to non-delegable functions and duties. *See Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328, 1336 (Fed. Cir. 2022) (citing *Schaghticoke Tribal Nation v. Kempthorne*, 587 F.3d 132, 135 (2d Cir. 2009); *Stand Up for Cal.! v. U.S. Dep't of Interior*, 994 F.3d 616, 622 (D.C. Cir. 2021) (observing FVRA applies to "exclusive duties").

[4] If a first nomination for the office does not result in a confirmation, an acting official may continue to serve for another 210 days, *id.* § 3346(b)(1), or, if a second nominated is submitted, during the pendency of that nomination, *id.* § 3346(b)(2)(A). And if a second nomination does not result in a confirmation, then an acting official may continue to serve for another 210 days. *Id.* § 3346(b)(2)(B).

role as Acting Commissioner during the nomination's pendency. (*Id.*) Subsequently, on July 16, 2018, Berryhill ratified the appointments of all SSA ALJs, including the ALJ in this case. (*Id.*)

However, because Berryhill's term had already expired in November 2017, Plaintiff claims that 5 U.S.C. § 3346(a) did not authorize Berryhill to resume her service as Acting Commissioner and thus, her appointment of Plaintiff's ALJ on July 16, 2018, exceeded her statutory authority. (Pl. Br. at 16–17.) Plaintiff argues that, because the ALJ who decided Plaintiff's case was not lawfully appointed, under *Carr v. Saul*, 141 S.Ct. 1352 (2021), she is entitled to a *de novo* hearing on remand before a new ALJ. (Pl. Reply Br. at 10.)

Plaintiff offers no independent arguments of her own as to the appropriate statutory interpretation of 5 U.S.C. § 3346(a) and instead, relies on two cases from the District of Minnesota, *Brian T.D. v. Kijakazi*, 580 F.Supp.3d 615 (D. Minn. 2022) and *Richard J.M. v. Kijakazi*, No. 19-827, 2022 WL 959914 (D. Minn. Mar. 30, 2022), to support her appointment clause argument. (Pl. Br. at 17 ("Plaintiff offers the exact same arguments here as the claimants in those cases.").) In those cases, the courts held that because the initial 210-day term for Berryhill's acting service had expired prior to the submission of Saul's nomination in April 2018, Berryhill could not return to her position as Acting Commissioner while Saul's nomination was pending and thus, could not lawfully ratify and approve the July 2018 ALJ appointments. *See* 580 F.Supp.3d at 629–32; 2022 WL 959914, at *8–10. [5]

For the following reasons, I disagree with Plaintiff, and adopt the prevailing interpretation, that 5 U.S.C. § 3346(a)(2) operates as a spring-back provision which permits an individual to resume his/her title as an official Acting Commissioner when a new Commissioner is nominated after the expiration of the initial 210-day term.

       i.   *Statutory Interpretation*

---

[5] Indeed, only district courts in the District of Minnesota have taken these views.

In statutory interpretation, the Court begins with the text. *Ross v. Blake*, 578 U.S. 632, 638 (2016); *see also Douglass v. Convergent Outsourcing*, 765 F.3d 299, 302 (3d Cir. 2014). "The role of the courts in interpreting a statute is to give effect to Congress's intent", and "it is presumed that Congress expresses its intent through the ordinary meaning of its language". *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir. 1998) (citations omitted). "If the language of the statute expresses Congress's intent with sufficient precision, the inquiry ends there and the statute is enforced according to its terms." *In re Lord Abbett Mut. Funds Fee Litig.*, 553 F.3d 248, 254 (3d Cir. 2009) (quoting *U.S. v. Gregg*, 226 F.3d 253, 257 (3d Cir. 2000)). To determine whether the statutory language is sufficiently precise and unambiguous, the Court "must examine 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001) (quoting *Marshak v. Treadwell*, 240 F.3d 184, 192–93 (3d Cir.2001)). The Court also considers "[t]he overall 'object and policy' of the statute and avoid[s] constructions that produce 'odd' or 'absurd results' or that are 'inconsistent with common sense.'" *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008) (internal quotations and citations omitted).

Here, the text at issue states that a "person serving as an acting officer as described under section 3345 may serve in the office … for no longer than 210 days beginning on the date the vacancy occurs; *or*", 5 U.S.C. § 3346(a)(1) (emphasis added), "once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate." *Id.* § 3346(a)(2).

At issue here is whether, under the plain meaning of the statute, § 3346(a)(2) contains a spring-back provision. The minority view, as set forth in *Brian T.D.*, rejected the notion of a spring-back. There, the court interpreted § 3346(a) to only apply to a person "presently serving" as Acting

Commissioner at the time of a nomination. *See* 580 F.Supp.3d at 629. Further, it found subsections (a)(1) and (a)(2) to be mutually exclusive, meaning that acting service must end upon the expiration of the initial 210-day time limit if a nomination had not occurred before that time. *See id.* at 631. And because, at the time of Saul's nomination, Berryhill's acting service had ended, she was not "presently serving" such that § 3346(a)(2) did not apply to her. *See id.* at 632.

The majority of all other courts that have considered this issue have declined to follow the reasoning set forth in *Brian T.D.* Instead, those courts have uniformly held that § 3346(a)(2) "'contains a spring-back provision that enabled [Berryhill] to [spring back into] her role as Acting Commissioner as of the date that Andrew Saul was nominated for Commissioner in April 2018.'" *Bauer v. Kijakazi*, No. 21-2008, 2022 WL 2918917, at *4 & n.29 (N.D. Iowa July 25, 2022) (quoting *Williams v. Kijakazi*, No. 21-141, 2022 WL 2163008, at *3 & n.3 (W.D.N.C. June 15, 2022)).[6]

Consistent with the majority of courts that have rejected the analysis set forth in *Brian T.D.*, I do so here as well. First, the *Brian T.D.* court's interpretation misconstrues the statute by reading additional language into the text of the statute. *See Snyder*, 2022 WL 4464847, at *19. Section 3346 refers to "the person *serving* as an acting officer as described under section 3345". 5 U.S.C. § 3346(a) (emphasis added). In turn, § 3345 sets out generally who may serve as an acting officer. *Id.* § 3345. But because the language of the statute uses the present participle "serving", the *Brian T.D.* court extrapolated that the section applies only to the person presently serving in that capacity.

---

[6] *See also Bernadette H., v. Comm'r Soc. Sec.*, No. 21-20586, 2022 WL 17080743, at *8–9 (D.N.J. Nov. 18, 2022); *M.A.K. v. Kijakazi*, No. 21-03028, 2022 WL 16855690, at *4 (D. Colo. Nov. 10, 2022); *Raymond N. v. Kijakazi*, No. 21-429, 2022 WL 16578854, at *10–11 (D. Neb. Nov. 1, 2022); *Reddick v. Kijakazi*, No. 21-01782, 2022 WL 16703903, at *17 (M.D. Pa. Oct. 7, 2022); *Neale v. Kijakazi*, No. 21-915, 2022 WL 6111689, at *9 (D. Del. Oct. 7, 2022); *Snyder v. Kijakazi*, No. 21-00103, 2022 WL 4464847, at *18–23 (N.D. Iowa Sept. 26, 2022); *Sidney M. v. Kijakazi*, No. 21-2034, 2022 WL 4482859, at *18 (N.D. Iowa Sept. 26, 2022); *Lance M. v. Kijakazi*, No. 21-628, 2022 WL 3009122, at *12–14 (E.D. Va. July 13, 2022); *Brooks v. Kijakazi*, No. 21-609, 2022 WL 2834345, at *16–23 (M.D.N.C. July 20, 2022); *Thomas S. v. Comm'r Soc. Sec.*, No. 21-05213, 2022 WL 268844, at *3 n.2 (W.D. Wash. Jan. 28, 2022).

*See* 580 F.Supp.3d at 629–30. However, such a finding is not supported by the plain language of the text. Nowhere in the text of the statute itself does the word "presently" or "currently" appear. Further, under this reading, the only way a person can serve during the pendency of a nomination under subsection (a)(2) is if that person was currently serving the initial 210-day term under subsection (a)(1). *See Bauer*, 2022 WL 2918917, at *7. Such a reading goes against the plain meaning of the statute. *See Bates v. U.S.*, 522 U.S. 23, 29 (1997) (stating that "we ordinarily resist reading words or elements into a statute that do not appear on its face"). Instead, this Court finds it more appropriate that while the word "serving" is in the present tense, its application is not limited to people presently serving; rather, it describes the person next designated to serve pursuant to § 3345. *See Snyder*, 2022 WL 4464847, at *19.

Second, this Court finds that the use of "or" between subsections (a)(1) and (a)(2) of § 3346 was meant to be inclusive. *See*, *e.g.*, *Bernadette H.*, 2022 WL 17080743, at *8–9; *Reddick*, 2022 WL 16703903 at *15. Courts have recognized that the word "or" can be used in either an inclusive, meaning "A or B, or both", or an exclusive sense, meaning "A or B, but not both", depending on the statutory context. *See Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015) (citations omitted); *see also U.S. v. One 1973 Rolls Royce, V.I.N. SRH-16266 By & Through Goodman*, 43 F.3d 794, 815 (3d Cir. 1994) ("Whether requirements in a statute are to be treated as disjunctive or conjunctive does not always turn on whether the word 'or' is used; rather it turns on context"); *Tex. Std. Oil Co. v. Forest Oil Corp.*, No. 05-490, 2008 WL 11399510, at *4 (S.D. Tex. Jan. 3, 2008) ("The meaning of *or* is usually inclusive." (internal quotations and citations omitted)).

In *Brian T.D.*, the court adopted an exclusive interpretation of the word "or" to mean that subsection (a)(1) and (a)(2) did not "create a series of non-contiguous periods of service." 580

F.Supp.3d at 631. Instead, it interpreted § 3346(a)(2) to extend the initial period of service under (a)(1) if, during those 210 days, a nominee for the office is named. *See id.* at 630–31 (finding that "subsection (a)(1) 'or' serves to suspend that time limitation, not to create an entirely separate and distinct period of service."). However, reading § 3346(a)(2) to "extend" the initial period of service when a nomination occurs within the initial 210 days incorrectly reads language into the statue that does not exist. Instead, the more natural reading is that, when a nomination occurs within the initial period of service, the acting officer may serve pursuant to the time limitations set forth in both subsection (a)(1) and subsection (a)(2). *See Bauer*, 2022 WL 2918917, at *7. Indeed, the context of the statute does not support an exclusive interpretation of "or". The text of § 3346(a) uses the word "or" without the use of any qualifying language such as "either", "but not both", or "limited to". *See* 5 U.S.C. § 3346(a)(1)–(2); *see also Brooks*, 2022 WL 2834345, at *20 (interpreting the word "or" in its more "common, inclusive sense"); *Bauer*, 2022 WL 2918917, at *7 n.39 (reading the word "or" to indicate the two subsections were mutually exclusive) (citing *Allstate Ins. Co. v. Plambeck*, 66 F. Supp. 3d 782, 788 (N.D. Tx. 2014)). Accordingly, this Court finds that the more natural reading of "or" in this provision allows for acting service during either or both of two periods: (1) for 210 days upon the date a vacancy occurs; or (2) during the pendency of a nomination if that nomination was submitted after the 210-day term expired. *See Republic of Sudan v. Harrison*, 139 S.Ct. 1048, 1056 (2019) (choosing the "most natural reading" of the statutory language over other plausible readings).

While this Court agrees with the majority of courts in interpreting the meaning of "or" to be inclusive, I depart from those courts in finding that the plain language of § 3346(a) is unambiguous as to whether subsection (a)(2) contains a spring-back provision permitting an acting

official to resume service during the pendency of a nomination, even if the nomination was submitted after the initial statutory period for acting service expires.

Here, the statute simply states that "once a first or second nomination ... is submitted," the acting official designated under the FVRA may serve "for the period that the nomination is pending". 5 U.S.C. § 3346(a)(2); *see also Raymond N.*, 2022 WL 16578854, at *10. The plain language of the statute does not include an express spring-back provision, nor does it provide any guidance in that regard. Further, nothing in the plain text of the statute under subsection (a)(2) conditions acting service on the submission of a nomination within the initial 210-day period. *See Neale*, 2022 WL 611689, at *9 (citing *Bauer*, 2022 WL 2918917, at *7; *Williams*, 2022 WL 2163008, at *3). Congress could have chosen to explicitly require nomination before the 210-day period expired. *See Lance M.*, 2022 WL 3009122, at *13 (citing 28 U.S.C. § 1367(d) (tolling the limitations period); 38 U.S.C. § 3103(b)(1) (preventing eligibility period from running under certain conditions)). On the other hand, the plain language of the statute does not specify that a nomination may be submitted even after the initial 210-day period. Such language Congress also could have chosen to adopt.

As such, the text is silent as to whether 3348(a)(2) to contain a spring-back provision. *See Va. Uranium, Inc. v. Warren*, 139 S.Ct. 1894, 1900 (2019) ("[I]t is our duty to respect not only what Congress wrote but, as importantly, what it didn't write."). Without such guidance, I find that the plain text of the statute is not unambiguous with respect to the application of § 3346(a)(2) in a situation in which the initial statutory period expires prior to the submission of a nomination.

ii.    *Legislative History and Extratextual Considerations*

When the plain meaning of a statute is not self-evident, then the text is "merely a starting point." *In re Price*, 370 F.3d 362, 369 (3d Cir. 2016). "Where a statute's text is ambiguous, relevant

legislative history, along with consideration of the statutory objectives, can be useful in illuminating its meaning." *U.S. v. E.I. Dupont De Nemours & Co. Inc.*, 432 F.3d 161, 169 (3d Cir. 2005) (citing *Gen. Dynamics Land Sys. v. Cline*, 540 U.S. 581, 600 (2004)); *see also G.L. v. Ligonier Valley School Dist. Auth.*, 802 F.3d 601, 621–22 (3d Cir. 2015) ("[L]egislative history can play a confirmatory role in resolving ambiguity when statutory language and structure support a given interpretation." (citations omitted)).

Here, the legislative history of the FVRA supports the inclusion of a spring-back provision in § 3346(a)(2). Indeed, Senate Committee members discussed and contemplated the specific at-issue situation in this case, that is when a nomination is submitted after the acting official's initial term under § 3346(a)(1) had expired. *See* S. Rep. No. 105-250, 105th Cong., 2nd Sess. 1998, 1998 WL 404532 (July 15, 1998).[7] The Senate Committee stated that one significant consideration that went into the statute's adoption was "the need for a 'cure' in the case of a nomination made subsequent to the expiration of [the time period for service by an acting official absent a nomination] to allow an acting official to resume the functions and duties of the vacant office". *Id.* at *30. In discussing the specific statutory provision at issue here, § 3346(a)(2), the Committee stated:

> Under new section 3346(a)(2), and subject to section 3346(b), an acting officer may serve *more than [210] days* if a first or second nomination is submitted to the Senate, and may serve while that nomination is pending from the date the nomination is submitted. The acting officer may serve *even if the nomination is submitted after the [initial 210] days has passed*".

---

[7] With the sole exception of changing the initial time period in § 3346(a)(1) from 150 days to 210 days, the proposed language is identical to the language that was ultimately adopted in 5 U.S.C. § 3346. *See Bauer*, 2022 WL 2918917, at *8.

*Id.* at *14 (emphases added); *see also id.* at *19 (discussing how the enforcement provision § 3348 tracks other provisions that allow the acting officer to serve once a nomination is made, "even if more than [210] days have elapsed".) As such, Congress clearly intended for the same individual to serve as an acting official for the initial 210-day period, under § 3346(a)(1), and, if a nomination was submitted after that period, to resume acting service upon that nomination, under § 3346(a)(2).

The Senate Report evinces legislative intent that further undermines the statutory interpretation adopted by the *Brian T.D.* court. For instance, the Senate Report clarified that § 3346(a)(1) and (a)(2) applied to "the *only person* eligible to be the acting officer, whether during the [210] days or upon submission of a nomination." *Id.* at 14–15 (emphasis added). In other words, Congress intended for § 3346(a)(2) to apply to the same individual who originally was eligible to be the acting officer at the time the vacancy arose under § 3346(a)(1). This legislative intent conflicts with the *Brian T.D.* court's analysis, which found that the plain language of § 3346(a)(2) only applied to a person presently serving as Acting Commissioner at the time of a nomination. *See* 580 F.Supp.3d at 629–30. Instead, the Senate Report reveals that the Senate intended for both subsections to apply to the same individual, regardless of whether the nomination was submitted while an acting officer was serving under the 210-day period. S. Rep. No. 105-250, 1998 WL 404532, at *14–15 (stating that the Committee chose its wording "deliberately" when it drafted the statutory language of § 3346 to apply to "[t]he person serving as an acting officer as described under section 3345.") Further, the Senate Report supports the interpretation of the word "or" between § 3346(a)(1) and (a)(2) to be inclusive, such that the same acting officer could serve under either or both time periods. *Id.* at *14 (stating that under § 3346(a)(2), "an acting officer may serve more than [210] days if a first or second nomination is submitted to the Senate, *and* may serve

while that nomination is pending from the date the nomination is submitted." (emphasis added)). The Committee's use of the word "and", rather than "or", in its explanation of § 3346(a)(2) is inconsistent with the *Brian T.D.* court's finding that the "or" in § 3346(a) was mutually exclusive such that Berryhill could serve for the 210-day period or during the pendency of a nomination, but not both. *See* 580 F.Supp.3d at 631.

The Committee's discussions of the operation and structure of enforcement provision § 3348 also support the interpretation of § 3346(a)(2) as incorporating a spring-back provision. It stated in the Senate Report that the "enforcement mechanism is to make an office vacant if, [210] days after the vacancy arises, no presidential nominee has been submitted to the Senate for the office." S. Rep 105-250, 1998 WL 404532, at *2. Between the date the initial 210-day term expired and the date that a nomination is made, "neither the acting officer nor anyone else could fill the vacant role." *Id*. at *18. This designated vacancy, however, could be filled when the President submits a nominee after the 210-day period, "whereupon the acting officer can *resume* service." *Id.* at *2 (emphasis added).

In drafting such an enforcement mechanism, the Committee recognized the potential administrative concerns in the event of a vacancy beyond the initial 210 days without a nomination. *Id.* at *19, *30–31) (stating that the Committee's goal in providing for an enforcement mechanism in the statute was neither "to punish or obstruct, nor to inconvenience for the purpose of inconveniencing", nor to "cause an unintended shutdown of the Federal agency ... due to administrative paralysis".) Accordingly, the Committee clarified that the vacancy only prevented duties "expressly vested by law or regulation exclusively in the vacant position" from being performed. *Id.* at *31. Delegable functions and "[a]l the normal functions of government thus could still be performed" by other officers or employees of the agency. *Id.* at *18. As such, Berryhill,

upon the expiration of her 210-day official acting service, continued to functionally lead the SSA and perform the normal and delegable duties of the SSA office. *See Patterson v. Berryhill*, No. 18-00193, 2018 WL 8367459, at *1 (W.D. Pa. June 14, 2018); *Mateo v. Berryhill*, No. 16-1057, 2018 WL 1965286, at *1 n.1 (M.D. Pa. Apr. 25, 2018). Upon Saul's nomination, she was able to return to her official title of Acting Commissioner. Indeed, the Committee specifically explained that any such inconvenience to the executive branch could be "eliminated instantly" upon the President's decision to make a nomination "for once such a nomination is made, the acting officer *can resume service*, including performing the non-delegable duties of the office." S. Rep. No. 105-250, 1998 WL 404532, at *19 (emphasis added).

Thus, the Committee's statements made in the Senate Report strongly evince that "the legislative intent was that 5 U.S.C. § 3346(a)(2) would provide an additional period of service upon submission of a nomination even if the initial 210-day term had expired". *Snyder*, 2022 WL4464847, at *22. The Court finds persuasive that the legislative history of the FVRA supports the statutory interpretation that § 3346(a)(2) contains a spring-back provision and authorizes a separate period of acting service. *See, e.g., Lance M*., 2022 WL 3009122, at *13–14; *Brooks*, 2022 WL 2834345, at *20; *Bauer*, 2022 WL2918917, at *8–9; *Williams*, 2022 WL 2163008, at *4.

Finally, guidance from both the Legislative Branch's Government Accountability Office ("GAO") and the U.S. Department of Justice's Office of Legal Counsel ("DOJ's OLC") provides further support for my interpretation of § 3346(a)(2). *See, e.g., Brooks*, 2022 WL 2834345, at *22–23; *Williams*, 2022 WL 2163008, at *4.

The Executive Branch has interpreted § 3346(a)(2) as containing a spring-back provision since the FVRA's enactment. In a memorandum published in 1999, DOJ's OLC expressly stated that subsection (a)(2) contains a spring-back provision:

The Vacancies Reform *Act incorporates a spring-back provision*, which permits the acting officer to begin performing the functions and duties of the vacant office *again* upon the submission of a nomination*, even if the 210-day period expired before that nomination was submitted*. If the 210-day limitation period expires before the President has submitted a nomination, the restrictions in § 3348 of the Act, which bar anyone from serving in an acting capacity, become operative.... If thereafter the President submits a nomination, an acting officer is again able to perform the functions and duties of the office as of the date the nomination is submitted.

DOJ's OLC, *Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 U.S. Op. O.L.C., 1999 WL 1262050, at *8 (Mar. 22, 1999) (emphases added).

The GAO's interpretation is not dissimilar. *See* GAO, *Violation of the 210-Day Limit Imposed by the Federal Vacancies Reform Act of 1998 — Department of Energy, Director of Office of Science*, No. B-328888 (Mar. 3, 2017), www.gao.gov/assets/b-328888.pdf (stating that 5 U.S.C. § 3346(a)(2) "contains a spring-back provision that allows an acting official to resume performing the duties of the office once a first or second nomination is submitted to the Senate for the period that such nomination is pending in the Senate.")[8]

Given these considerations, this Court finds that Berryhill was validly serving as Acting Commissioner under 5 U.S.C. § 3346(a) of the FVRA when she ratified the appointment of Plaintiff's ALJ in 2018. From January 20, 2017 to November 16, 2017, Berryhill served as Acting Commissioner. Following the expiration of Berryhill's initial 210-day term, from November 2017 to April 2018, the position of Commissioner became vacant, and Berryhill no longer served under the official title of Acting Commissioner. During that time, she continued to functionally lead the SSA from her prior position as Deputy Commissioner of Operations. *See Mateo*, 2018 WL 1965286, at *1 n.1. And pursuant to this Court's finding *supra*, that the two time periods in §

---

[8] In reaching the same statutory interpretation as the GAO and the DOJ's OLC, this Court does not defer to either agency's analysis of the FVRA. However, reviewing the guidance published by both agencies reinforces the finding from this Court's separate analysis that Congress intended for 5 U.S.C. § 3346(a)(1) and (a)(2) to authorize a person in Berryhill's position to serve in two separate periods of acting service.

3346(a)(1) and (a)(2) were inclusive, Berryhill remained eligible to return to her official title as Acting Commissioner upon the submission of a nomination. Thus, on April 17, 2018, upon the nomination of Saul, § 3346(a)(2) permitted Berryhill to spring back into her role as Acting Commissioner during the nomination's pendency. Therefore, Plaintiff's ALJ was properly appointed.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, the ALJ's decision is **AFFIRMED**. An appropriate order shall follow.

**DATED**: December 19, 2022

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge
